IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH
CAROLINA NORTHERN DIVISION
No. _____

| | |
|---|---|
| **MICHAEL SEAN PARTAIN,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | **COMPLAINT** |
| vs. ) | **JURY TRIAL DEMANDED** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| Defendant. ) | |

Plaintiff, MICHAEL SEAN PARTAIN, files this Complaint against Defendant, the UNITED STATES OF AMERICA. This Complaint alleges a federal cause of action and is brought solely pursuant to Section 804(b) of the "Camp Lejeune Justice Act of 2022" (hereinafter "the Act"). In support thereof, Plaintiff alleges the following:

## **INTRODUCTION**

1.  For decades the water at Marine Corps Base Camp Lejeune was contaminated with toxic chemicals known to cause cancer and a host of other chronic—often deadly—diseases and conditions. Hundreds of thousands of servicemembers, their families and civilian employees drank, bathed in, cooked with, and swam in that water. Nevertheless, in violation of military governing orders and basic duties of decency, the federal government and its agents allowed toxic chemicals from industrial facilities, fuel tanks, improper waste disposal practices and dry-cleaning operations to seep into the base's drinking water supply. This disregard for the health, safety, and welfare affected not only our servicemembers, who were willing to lay down their lives for their country, but their families as well. Indeed, for decades the federal government did not even bother to test the water.

2.  Thousands of service members and their families who resided at the base, and the

1

civilian employees who worked at the base, between the 1950s and the 1980s have contracted serious diseases and chronic conditions as a result of their exposure to the contaminated water, including but not limited to: bladder cancer, kidney cancer, liver cancer, adult and childhood Leukemia, Multiple Myeloma, Parkinson's Disease, Non-Hodgkin's Lymphoma, cardiac defects, kidney disease/End Stage Renal Disease, Aplastic Anemia, Myelodysplastic Syndrome, Systemic Sclerosis/Scleroderma, brain cancer, pancreatic cancer, soft tissue sarcoma, rectal cancer, lung cancer, esophageal cancer, Amyotrophic Lateral Sclerosis, male and female breast cancer, and cervical cancer. Camp Lejeune's toxic water has also been linked to widespread birth defects, childhood cancers, and high rates of miscarriage and stillborn babies.

3. At all times relevant, Plaintiff was unable to mitigate his damages as the result of the Defendant's failure and refusal to provide its full knowledge of the historical facts and information concerning the scope and breath of the drinking water contamination at Camp Lejeune. As a result of these failures, the Camp Lejeune community was unaware of the health consequences from exposure to the contaminants found in the drinking water at the base.

4. When the truth about Camp Lejeune's water finally emerged in the early 2000s, the United States faced thousands of claims for compensation on behalf of the people injured or killed by its conduct. But instead of compensating servicemembers and others for their injuries, the United States steadfastly refused to pay their claims. When lawsuits were filed under the Federal Tort Claims Act ("FTCA") in federal court, the United States escaped liability by invoking North Carolina's ten-year statute of repose—which operated to bar all of the claims even though the federal government's malfeasance and misconduct had not sufficiently come to light until well after the statutory period had run.

5. Now the United States is making efforts to fulfill its obligation to the servicemembers and their families who resided at the base and the civilian employees who worked at the base, during

the period in which the water was contaminated. Section 804(b) of the Act establishes a simple cause of action permitting individuals who were harmed by the contaminated water at Camp Lejeune over the relevant period of time to obtain relief in this Court. Specifically, "[a]n individual . . . who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune." *Id.* To meet the burden of proof, a plaintiff need only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is . . . sufficient to conclude that a causal relationship is at least as likely as not." Section 804(c)(2) of the Act.

## **THE PARTIES, JURISDICTION, AND VENUE**

6. Plaintiff, MICHAEL SEAN PARTAIN, is currently a citizen and resident of Homosassa, Florida. Between August 1, 1953 and December 31, 1987, Plaintiff resided, worked or was otherwise exposed for not less than thirty (30) days to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

7. Defendant, United States of America, is the party responsible for damages caused by its military service components, including responsibility for the United States Navy and United States Marine Corps and related facilities. Defendant has waived its sovereign immunity from suit under Section 804(f) of the Act. Defendant, United States of America, may be served in this matter by serving Michael Francis Easley, Jr., U.S. Atty. For the Eastern District of North Carolina, Office of the United States Attorney, 150 Fayetteville Street, Suite 2100, Raleigh, North Carolina 27601.

8. The United States District Court for the Eastern District of North Carolina has exclusive jurisdiction over any action filed under Section 804(b) of the Act and is the exclusive

venue for this action. Section 804(d) of the Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1331. Moreover, the amount in controversy exceeds $75,000, exclusive of interest and costs.

## **CONDITIONS PRECEDENT**

9. All conditions precedent to the filing of this action and to the Plaintiffs' right(s) to the relief sought have occurred, have been performed, or have been excused as set out below.

## **FACTUAL ALLEGATIONS**

**General History of Water Contamination at Camp Lejeune**

10. Established in 1941, Camp Lejeune has long served as a major training facility for the Marine Corps. At all times relevant, Defendant owned, controlled and/or operated the military base, to include its water supply and distribution system, located at and known as Marine Corps Base, Camp Lejeune, North Carolina.

11. Historically, Camp Lejeune's drinking water was extracted from over 100 supply wells, treated at eight treatment plants, and distributed to its residents through a network of water distribution system pipelines. The base housing areas were served by among others, three main water supply and distribution systems that produced drinking water for the base: Tarawa Terrace (beginning in 1952); Holcomb Boulevard (starting June 1972); and Hadnot Point (beginning in 1942). Those systems consisted of raw water collection wells, a water treatment plant, and a distribution system.

12. Beginning in the mid-1950s, toxic chemicals from various sources, including unlined landfills, improper disposal practices, and leaking storage tanks, seeped into the soil and groundwater of Camp Lejeune and ultimately contaminated many of the wells used to supply the water-treatment plants.

13. Operation of Camp LeJeune Marine Corp Base's water supply systems was governed

by internal Naval potable water regulations titled NAVMED-P-5010-5 between August 1963 and December 1988. The NAVMEDs were promulgated to Naval and Marine installations through a series of instructions known as BUMEDS.

14. On October 1st 1980, a composite water sample comprised of all of Camp Lejeune's water treatment systems was taken. The results revealed the presence of trichlorethylene and vinyl chloride were in the water. Between 1980 and May of 1982, three (3) different laboratories found VOC contamination in Camp Lejeune's tap water.

15. The second laboratory to test Camp Lejeune's water was the U.S. Army Environmental Hygiene Agency (USAEHA) laboratory. This testing was for the Hadnot Point water distribution system and did not include Tarawa Terrace. Their October 1980 analytical data sheet contained a handwritten warning: "water is highly contaminated with low molecular weight halogenated hydrocarbons. Their second testing in December 1980 contained another handwritten warning stating: "Heavy Organic interference at CHCL2BR. You need to analyze for chlorinated organics by GC/MS[1]." A third written warning was delivered by the USAEHA in March of 1981, this time the lab services chief, William Neal, wrote: "(w)ater highly contaminated with other chlorinated hydrocarbons (solvents!)." No documented action was taken to inform the personnel aboard Camp Lejeune or to remedy the VOC contamination found in the water.

16. The third laboratory to test Camp Lejeune's water was Grainger Laboratory, owned by Michael Hargett. Grainger Laboratory was tasked to analyze both the Hadnot Point water distribution system and Tarawa Terrace. Between May 1982 and August 1982, Mr. Hargett informed first, the base supervisory chemist, Elizabeth Betz, then the base Assistant Chief of Staff for Facilities, Colonel John T Marshall that both water distribution systems were contaminated with VOCs. The highest TCE reading at that time was found at the Naval Hospital which had a TCE

---
[1] Gas chromatograph / Mass Spectrometer.

reading of 1400 parts per billion in the tap water. Hargett then performed testing which determined that the source of drinking water contamination for Tarawa Terrace and Hadnot Point water distribution systems originated from their respective raw water well fields. No documented action was taken by the defendant to remedy the VOC contamination nor were personnel at the base informed.

17. In the summer 1981, the defendant sampled the water from the Rifle Range water distribution system which served a small number of personnel aboard the base but was located in close proximity to an EPA registered chemical dump. The wellfield was sampled and the source of the contamination in that system was determined to be well RR-97, which was then taken off line.

18. In June 1983, Michael Hargett informed the state of North Carolina of the VOC problems his laboratory found on the base that then prompted a letter from Larry Elmore to Colonel Marshall requesting the analytical data sheets. Six months later, Colonel Marshall's replacement, Colonel Lilley, refused to provide the analytical data sheets which contained information about the VOC contamination.

19. The Defendant finally began to take action in late 1984 after an internal environmental remediation program identified the presence of VOCs and benzene in Camp Lejeune's water. Between November 1984 and February 1985, a total of 10 wells were taken off line for VOC contamination. Testing performed in or about February 1985, found TCE in the water supply and distribution system was as high as 1,148 parts per billion in the Berkeley Manor Elementary School area of Camp Lejeune. The 1,148 parts per billion reading was the result of the worst contaminated well at Camp Lejeune, well HP-651. At the time of the sampling, it was the only contaminated well left operating on the Hadnot Point water supply system. This well was found to have 18,900 parts per billion of TCE, 400 parts per billion of PCE, 8,070 parts per billion of dichloroethylene and 655 parts per billion of vinyl chloride. A month later, in March 1985, the PCE

levels at the bulk water storage tank in the Tarawa Terrace water supply system was found to be at 215 parts per billion.

20. In addition to the Hadnot Point and Tarawa Terrace distribution systems, the Holcomb Boulevard distribution system was intermittently contaminated by Hadnot Point water between 1972 and 1985. And as noted above, before 1972, the Holcomb Boulevard area was supplied with water by the Hadnot Point system.

21. Period media articles and internal memos to base personnel did not disclose the true nature of the drinking water contamination found by the Defendant. In April 1985, the base Commanding General, Major General L.H. Buehl informed base personnel: "minute (trace) amounts of several organic chemicals have been detected in the water. There are no definitive state or Federal regulations regarding safe levels of these compounds, but as a precaution, I have ordered closure of these well." In September 1985, the base Environmental Engineer, Robert Alexander, was quoted in the Raleigh News and Observer that "people had not been directly exposed to the pollutants."

22. The Defendant's own historical reconstruction modeling of the drinking water contamination indicated that TCE and PCE levels above their current MCLs were likely present in the distribution systems beginning in the 1950s. The current U.S. maximum contaminant levels ("MCLs") for TCE and PCE are 5 ppb. The MCLs for vinyl chloride and benzene are 2 ppb and 5 ppb, respectively. The MCLs for TCE, vinyl chloride and benzene were in effect as of 1989, and the MCL for PCE was in effect as of 1992. The last of the contaminated supply wells producing water for Camp LeJeune were finally shut down in March 1987.

23. Subsequently, Camp Lejeune was placed on the EPA's National Priorities List ("NPL") on October 4, 1989 and declared to be a federal Superfund site because of the hazardous, wide-spread high-level of contamination at the base. By 1991, all groundwater contaminant

investigations and remediation activities at Camp Lejeune were placed under the oversight of the Defendant's Comprehensive Environmental Response, Compensation and Liability Act and the State of North Carolina's Resource Conservation and Recovery Act.

24. Once placed on the NPL, the United States Agency for Toxic Substances and Disease Registry ("ATSDR"), a statutorily created agency and operating division within the Department of Health and Human Services. As directed or requested by Defendant's Environmental Protection Agency, ATSDR was responsible for completing a Public Health Assessment ("PHA"). In 1997, the ATSDR completed and published a PHA for Camp Lejeune concluding that individuals who served or resided at Camp Lejeune had been exposed to contaminants of concern in the drinking water.

25. The 1997 ATSDR PHA was removed from the agency's website in 2009 after new information was uncovered indicating that benzene had been present in the Hadnot Point water distribution system.

26. After the removal of the 1997 PHA, the ATSDR completed five health studies of Camp Lejeune:

(i) A 2013 study of whether *in utero* and infant exposures to contaminated drinking water were associated with birth defects suggested an association between drinking water contaminants and neural tube defects. The study found an increased risk of birth defects and certain childhood cancers.

(ii) A 2014 study compared mortality rates among Marine and naval personnel stationed at Camp Lejeune with mortality rates for Marine Corps personnel stationed at Camp Pendleton, a Marine Corps base located in Oceanside, California. The study found an elevated mortality rate for the Camp Lejeune personnel for several causes of death, including multiple myeloma, Hodgkin lymphoma, and cancers of the kidney, liver,

esophagus, and cervix.

(iii) A 2014 study found that civilians who worked at Camp Lejeune from 1973 to 1985 had elevated mortality hazard ratios for kidney cancer, leukemias, multiple myelomas, rectal cancer, oral cavity cancer, and Parkinson's disease.

(iv) A 2014 study of mothers who lived at Camp Lejeune at the time of delivery suggested associations between TCE exposure and low birth weight and other birth issues. It also found an association between PCE exposure and the risk of preterm birth and an association between benzene exposure and term low birth weight.

(v) A 2015 study focused on the occurrence and onset of male breast cancer and found exposure to the contaminated drinking water resulted in an increased risk of early onset male breast cancer.

27. In January 2017, the ATSDR published a revised PHA for Camp Lejeune.

(i) **Hadnot Point Water System.** The 2017 PHA concluded that "residents, workers, Marine and naval personnel, and Marines-in-training at MCB Camp Lejeune were in the past exposed to contaminants in drinking water supplied by the Hadnot Point [water treatment plant]." It further concluded that "this contaminant exposure was at levels that could have harmed their health" and that "[t]he estimated levels to which all the above-mentioned groups of people were exposed could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects." According to the ATSDR, "[t]richloroethylene (TCE) and vinyl chloride were the chemicals that contributed most to the increased cancer risk."

(ii) **Tarawa Terrace Water System**. The 2017 PHA concluded that "the Tarawa Terrace [water treatment plant] might have harmed the health of young children," including through "an increased risk of cancer," and that "Marines living in the Tarawa Terrace area

9

who were exposed to water from the Hadnot Point [water treatment plant] during training may have had a higher risk of health-related problems."

(iii) **Holcomb Boulevard Water System**. The 2017 PHA concluded that prior to 1972, when the Holcomb Boulevard Water System was served by the Hadnot Point water treatment plant, residents' exposure to contaminants "could have resulted in an increased cancer risk and increased potential of experiencing adverse, noncancer health effects."

(iv) **Lead exposure**. The 2017 Public Health Assessment concluded that "past exposure to lead found in tap water at 19 locations could have harmed people's health."

(v) **Other Exposures**. The 2017 PHA concluded that Marines and civilians who trained in indoor swimming pools in the Hadnot Point area between the early 1950s and 1985, as well as civilians who worked at laundry facilities, were exposed to contaminants at levels that might have harmed their health.

ATSDR completed several epidemiological studies to determine if Marines, Navy personnel and civilians residing and working on U.S. Marine Corps Base Camp Lejeune were at increased risk for certain health effects as a result of exposure to water contaminated with volatile organic compounds.

28. The 2017 ATSDR report concluded, in terms of presumptive service-related diseases at that time, that a causal relationship exists between the following diseases and the contaminants in the Camp Lejeune water supply or that a causal relationship is at least as likely as not: kidney cancer; non-Hodgkin's lymphoma; multiple myeloma; leukemia; liver cancer; bladder cancer; Parkinson's disease; end-stage renal disease; systematic sclerosis/scleroderma; and cardiac defects.

29. Through statutory enactments and regulatory actions, Congress and the Executive Branch have both recognized the link between exposure to Camp Lejeune's contaminated water and a number of serious diseases and conditions.

30. In 2012, Congress enacted the Honoring America's Veterans and Caring for Camp

Lejeune Families Act, Pub. L. No. 112-554, 126 Stat. 1165. Title I of the statute is entitled the Janey Ensminger Act, in honor of the nine-year-old daughter of Marine Jerry Ensminger, who died of a cancer that she developed from exposure to the water at Camp Lejeune. *Id.* § 101, 126 Stat. 1167.

31. The Janey Ensminger Act provides that veterans and their families (including babies who were *in utero*) who served or resided at Camp Lejeune for at least 30 days between 1957 and 1987 are entitled to receive hospital care and medical benefits for fifteen specified illnesses or conditions without having to prove a connection between a veteran's military service and the illness or condition. 38 U.S.C. § 1710(e)(1)(F), 1787(a) (2012). Those illnesses and conditions are esophageal cancer, lung cancer, breast cancer, bladder cancer, kidney cancer, leukemia, multiple myeloma, myelodysplastic syndromes, renal toxicity, hepatic steatosis, female infertility, miscarriage, scleroderma, neurobehavioral effects and non-Hodgkin's lymphoma. 38 U.S.C. § 1710(e)(1)(F).

32. Congress later expanded the pool of victims eligible for hospital care and medical benefits to those who had served or resided at Camp Lejeune as early as August 1, 1953. Consolidated and Further Continuing Appropriations Act, 2015, Div. I, Tit. I, § 243, Pub. L. No. 113-235 (codified at 38 U.S.C. § 1710(e)(1)(F)).

33. In January 2017, the U.S. Department of Veterans Affairs promulgated a regulation establishing that veterans exposed to the water at Camp Lejeune are entitled to certain disability benefits. Final Rule, Diseases Associated with Exposure to Contaminants in the Water Supply at Camp Lejeune, 82 Fed. Reg. 4173 (Jan. 13, 2017). The regulation provides that a veteran who served at least 30 days at Camp Lejeune between August 1, 1953, and December 31, 1987, "shall be presumed to have been exposed during such service to the contaminants in the water supply." 38 C.F.R. § 3.307(a)(7)(iii). The regulation further provides that if the veteran develops one of eight specified diseases, the Department of Veterans Affairs "will presume that the individual concerned

became disabled during that service" for certain purposes. 38 C.F.R. § 3.307(a)(7)(iv). Those eight diseases include two diseases not covered by the Janey Ensminger Act—liver cancer and Parkinson's disease—in addition to bladder cancer, kidney cancer, adult leukemia, multiple myeloma, aplastic anemia and other myelodysplastic syndromes, and non-Hodgkin's lymphoma. 38 C.F.R. § 3.309(f).

34. Although the 2017 rule provides disability benefits to servicemembers, it does not provide other forms of compensation and it does not provide any compensation for non-servicemembers who were injured by the contaminated water at Camp Lejeune. n 2008, over a half century after the water at Camp Lejeune first became contaminated, Congressional legislation required the United States Navy to begin notifying affected individuals about "past water quality issues" at Camp Lejeune. In light of that disclosure, over four thousand veterans and other individuals filed administrative claims with the Navy seeking compensation for the injuries.

35. In a number of injured servicemembers and others whose administrative claims were denied brought suits against the United States in various federal district courts under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680.

36. As a general matter, the complaints alleged that the government was negligent in its operation and maintenance of the water supply system at Camp Lejeune and had failed to comply with its duty to warn servicemembers and others about their risk of developing cancer and other diseases and conditions following their exposure to the water at Camp Lejeune. The complaints explained that the United States had a legal duty to ensure that the water supply was safe for drinking and other purposes, properly constructing wells, and ensuring that the wells could not be contaminated by the surrounding land. The complaints pointed to orders issued by the Department of Navy Bureau of Medicine and Surgery in 1972, the BUMEDS mentioned above, that imposed a detailed set of requirements to ensure water safety—orders that the United States failed to follow.

37. The complaints further alleged that the United States and its agents had themselves caused, or permitted, large quantities of chlorinated solvents and other contaminants to be dumped or disposed of within Camp Lejeune without warning residents. The complaints also alleged that even after the United States knew or should have known that the water supply was dangerously contaminated, it failed to take the necessary steps to warn at-risk individuals and correct the problem.

38. In 2011, the Camp Lejeune cases were consolidated in a Multi-District Litigation ("MDL") in the Northern District of Georgia (MDL No. 2218).

39. On December 15, 2016, the District Court dismissed the claims on the basis of North Carolina's statute of repose without reaching the merits of the plaintiffs' negligence and duty-to-warn claims. *See In re Camp Lejeune N.C. Water Contamination Litig.*, 263 F. Supp. 3d 1318 (N.D. Ga. 2016). Notably, the Navy had previously written an amicus brief, in support of a polluter, urging the United States Supreme Court to use the North Carolina statue of repose to dismiss a similar case thereby aiding in the creation of the precedent that the District Court followed.

40. On May 22, 2019, the U.S. Court of Appeals for the Eleventh Circuit affirmed the District Court's dismissal. *See In re Camp Lejeune, North Carolina Water Contamination Litig.*, 774 F. App'x 564 (11th Cir. 2019).

41. In the wake of the District Court's decision, the Navy elected to deny all of the thousands of pending claims seeking compensation for harms caused by the government's failure to ensure safe water at Camp Lejeune. The Navy took the position that it lacked the legal authority to pay the claims in light of the District Court's ruling.

42. On August 10, 2022, President Biden signed into law the Camp Lejeune Justice Act of 2022. The purpose of the legislation is to, *inter alia*, supersede the judicial rulings that barred recovery under the FTCA for individuals injured by the contaminated water at Camp Lejeune.

43. Section 804(b) of the Act establishes a new federal cause of action specifically for those affected by the extensive contamination at Camp Lejeune. It provides that:

> an individual, including a veteran (as defined in section 101 of title 38, United States Code), or the legal representative of such an individual, who resided, worked, or was otherwise exposed (including in utero exposure) for not less than 30 days during the period beginning on August 1, 1953, and ending on December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States may bring an action in the United States District Court for the Eastern District of North Carolina to obtain appropriate relief for harm that was caused by exposure to the water at Camp Lejeune.

44. The Act "appl[ies] only to a claim arising before the date of enactment of this Act." The statute expressly incorporates the FTCA's requirement that a claim must be presented to the relevant federal agency before the judicial action may proceed. Section 804(h) of the Act (cross-referencing 28 U.S.C. § 2675). Under that provision, if the federal agency fails to make a final disposition of a claim within six months of its filing, the claim is "deemed" denied, allowing the claimant to file an action in court. 28 U.S.C. § 2675(a).

45. The Act makes clear that a plaintiff may obtain a recovery for a "latent disease." Section 804(c)(1).

46. To meet the burden of proof under the Act, a plaintiff must only "produce evidence showing that the relationship between exposure to the water at Camp Lejeune and the harm is—

(A) sufficient to conclude that a causal relationship exists; or (B) sufficient to conclude that a causal relationship is at least as likely as not." Section 804(c)(2).

47. The Act includes its own statute of limitations and expressly makes inapplicable any other statute of repose or statute of limitations. Section 804(j). The Act's statute of limitations provides that "[a] claim in an action under this section may not be commenced after the later of—

(A) the date that is 2 years after the date of enactment of this Act; or (B) the date that is 180 days after the date on which the claim is denied under section 2675 of title 28, United States Code." *Id.*

## COUNT ONE: RECOVERY UNDER THE CAMP LEJEUNE JUSTICE ACT

48. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

49. Plaintiff, MICHAEL SEAN PARTAIN, resided, worked or was otherwise exposed for not less than thirty (30) days between August 1, 1953 and December 31, 1987, to water at Camp Lejeune, North Carolina, that was supplied by, or on behalf of, the United States.

50. During this time, Plaintiff was exposed to amounts of water supplied by Defendant or its agents at Camp Lejeune. The water supplied to Plaintiff by or on behalf of Defendant was polluted and contaminated as described herein with chemicals including but not limited to TCE, PCE, vinyl chloride and benzene.

51. Subsequently, Plaintiff MICHAEL SEAN PARTAIN was diagnosed with serious life-threatening illnesses, including breast cancer, on a date before the enactment of the Act.

52. A causal relationship exists between Plaintiff's illnesses, including his breast cancer and the contaminants the Plaintiff was exposed to in the Camp Lejeune water supply. The causal relationship is at least as likely as not.

53. On or about August 10, 2022, pursuant to the Camp Lejeune Justice Act, Plaintiff MICHAEL SEAN PARTAIN filed an administrative claim for compensation with the United States Navy pursuant to 28 U.S.C. § 2675. Subsequently, the Navy denied the claim or the claim was constructively denied pursuant to 28 U.S.C. § 2675(a) because the Navy failed to dispose of the claim within six months of the date of filing, thereby satisfying the requirements of the statute. See Ex. A.

## CLAIM FOR RELIEF

Plaintiff respectfully requests that, pursuant to Section 804 of the Act, the Court enter judgment against the United States and award damages and all other appropriate relief for the harm to Plaintiff that was caused by exposure to the water at Camp Lejeune.

# **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 804 of the Act.

Dated: February 11, 2023

Respectfully submitted,

*/s/Thomas W. Henson, Jr.*
Thomas W. Henson, Jr.
HENSON & FUERST, P.A.
3110 Edwards Mill Rd.
Ste. 210
Raleigh, NC 27612
(919) 781-1107
Fax: (252) 443-9429
thomashenson@lawmed.com
North Carolina Bar. No. 16669

And

WATTS GUERRA LLC
Mikal C. Watts (to make *Special Appearance*)
5726 Hausman Rd. W., Ste. 119
San Antonio, Texas 78249
(210) 447-0500
efilemcwatts@wattsguerra.com

ATTORNEYS FOR THE PLAINTIFF